**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

DAVID W. BUSSE,
       Plaintiff,

    vs.

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

Case No. 1:14-cv-590

Barrett, J.
Litkovitz, M.J.

**REPORT AND**
**RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial

review of the final decision of the Commissioner of Social Security (Commissioner) denying

plaintiff's applications for disability insurance benefits (DIB) and supplemental security income

(SSI). This matter is before the Court on plaintiff's Statement of Errors (Doc. 6), and the

Commissioner's response in opposition (Doc. 11).

**I. Procedural Background**

Plaintiff filed applications for DIB and SSI in November 2010, alleging disability since

September 8, 2010, due to bi-polar disorder, severe depression, being "unable to handle stress,"

and extreme numbness and pain in his extremities. (Tr. 392). These applications were denied

initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a *de*

*novo* hearing before administrative law judge (ALJ) Deborah Smith. Plaintiff, plaintiff's case

manager, and a vocational expert (VE) appeared and testified at the ALJ hearing. On February

4, 2013, the ALJ issued a decision denying plaintiff's DIB and SSI applications. Plaintiff's

request for review by the Appeals Council was denied, making the decision of the ALJ the final

administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541,

548 (6th Cir. 2004).   Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy.   *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th

Cir. 1999).

   **B.   The Administrative Law Judge's Findings**

   The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

   1. The [plaintiff] meets the insured status requirements of the Social Security Act
   through December 31, 2015.

   2. The [plaintiff] has not engaged in substantial gainful activity since September
   8, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

   3. The [plaintiff] has the following severe impairments: bipolar disorder and
   alcohol abuse (20 CFR 404.1520(c) and 416.920(c)).

   4. The [plaintiff] does not have an impairment or combination of impairments that
   meets or medically equals the severity of one of the listed impairments in 20
   C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525,
   404.1526, 416.920(d), 416.925 and 416.926).

   5. After careful consideration of the entire record, the [ALJ] finds that the
   [plaintiff] has the residual functional capacity to perform a full range of work at
   all exertional levels but with the following nonexertional limitations: he is capable
   of completing 3-4 step tasks that do not have strict production standards or
   schedules, in an environment that does not require more than superficial social
   interactions and where he could work in smaller groups of familiar others.

   6. The [plaintiff] is capable of performing his past relevant work as a metal
   cleaner.   This work does not require the performance of work-related activities
   precluded by the [plaintiff]'s residual functional capacity (20 CFR 404.1565 and
   416.965).

   7. The [plaintiff] has not been under a disability, as defined in the Social Security
   Act, from September 8, 2010, through the date of this decision (20 C.F.R.
   404.1520(f) and 416.920(f)).

3

(Tr. 81-90).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*,

478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229

(1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a

preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In

deciding whether the Commissioner's findings are supported by substantial evidence, the Court

considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the

disability determination. Even if substantial evidence supports the ALJ's conclusion that the

plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails

to follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).

*See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was

otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving

weight to treating physician's opinion, thereby violating the agency's own regulations).

4

**D.  Specific Errors**

Plaintiff raises the following assignments of error on appeal: (1) the ALJ erred in

formulating plaintiff's residual functional capacity (RFC) by omitting work-related limitations

found by the state agency reviewing psychologists, the consultative examining psychologist, and

plaintiff's treating psychiatrist; (2) the ALJ erred in weighing the mental health medical opinions

of record; (3) the ALJ improperly discounted plaintiff's credibility; and (4) the ALJ erred at Step

Five of the sequential evaluation process by relying on the VE's response to a hypothetical

question that does not reflect all of plaintiff's supported limitations.   (Doc. 6).

1. Whether the ALJ erred in formulating plaintiff's RFC.

The following summary of the mental health medical evidence of record provides the

necessary background for analyzing plaintiff's arguments.   Plaintiff sought mental health

treatment from Mental Health Access Point on September 11, 2009, and reported a history of

psychosis and mood disorder.   (Tr. 528-37).   Plaintiff also reported that his depressive

symptoms had worsened and it was increasingly difficult for him to get out of bed and sustain

employment.   (Tr. 531).   He reported anhedonia, hypersomnia, feelings of worthlessness,

difficulty concentrating, and experiencing recurrent thoughts of death, and stated that he

attempted suicide the month prior but was no longer feeling suicidal.   (*Id*.).   Plaintiff reported a

history of auditory and visual hallucinations since he was 17 years old that were treated with

medication and said he was receiving regular Haldol injections from his primary care physician.

(*Id*.).   On mental status examination, plaintiff's grooming was appropriate; he was able to

engage and was cooperative and pleasant; his affect was broad and full; his mood was depressed

and he had depressive thought content; his thought processes were tight, attentive, coherent, and

5

logical; his speech was within normal limits; his psycho-motor functioning was normal; and his judgment was fair. (Tr. 532). Plaintiff reported he had not had hallucinations for years due to his antipsychotic medication. (*Id.*). The intake social worker found that plaintiff's primary presenting problem was depression and that his psychosis appeared controlled with medication. (Tr. 537). The social worker recommended pharmaceutical management services to monitor plaintiff's medication and mental status and individual counseling to assist with working through depression and developing better coping skills. (*Id.*).

Plaintiff received mental health treatment at Centerpoint Health from September 11, 2009, through at least September 2012. (Tr. 573-600, 672-85, 959-66, 994-1022). September 2009 case management records show that plaintiff was having suicidal thoughts but also seeking employment in a low stress environment. (Tr. 586-87). Plaintiff was diagnosed with "Major Depressive Disorder Recurrent Episode, severe, specified as with psychotic behavior." (Tr. 588).

Pursuant to a February 2010 mental status examination, plaintiff's treating psychiatrist at Centerpoint Health, Dr. Rahman, observed that plaintiff exhibited appropriate dress and hygiene; his speech was within normal limits; his mood was euthymic; he was mildly anxious, organized, and goal directed; he had no suicidal or homicidal ideation; and his insight and judgment were fair. (Tr. 584). Dr. Rahman diagnosed plaintiff with Bipolar I Disorder, most recent episode depressed, unspecified,[1] and recommended Abilify, but plaintiff refused stating that he felt comfortable on Haldol alone. (Tr. 585). May and June 2010 progress notes include

---

[1]Dr. Rahman's treatment note simply provides "296.5" - the code for this diagnosis as set forth in the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV). *See* Tr. 585. *See also* American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders 348 (4TH ED. 2000) (DSM-IV), http://psychcentral.com/disorders/sx20-c.htm (last visited May 28, 2015).

6

observations that plaintiff was cooperative and had good eye contact; he was sleeping 8-9 hours a

night; he had no suicidal or homicidal ideation; he had linear thought processes; and his mood

was "ok" or "tired" with congruent affect. (Tr. 580, 582). A December 2010 progress note

documents that plaintiff was euthymic; he had no suicidal or homicidal ideation; and his mood,

sleep, and appetite were reported as "stable." (Tr. 681).

Plaintiff underwent an assessment update in February 2011. (Tr. 592-97). Plaintiff

reported that he was diagnosed with schizophrenia at age 17, which changed to a diagnosis of

bipolar disorder in this twenties and "that diagnosis has stuck." (Tr. 592). Plaintiff was found

to be well oriented; he was cooperative; he had good impulse control, tense posture, restless

psychomotor activity, and pressured and stammering speech; his stream of thought was clear and

coherent; and his mood was euthymic with appropriate affect. (Tr. 592). Plaintiff reported that

he drinks two to three beers socially about every one to two weeks and said that he got

intoxicated several months ago but that "that does not happen very often." (Tr. 593). Plaintiff

was diagnosed with Bipolar I Disorder, most recent episode mixed, severe with psychotic

features. (Tr. 597). Plaintiff was assigned a Global Assessment of Functioning (GAF) score of

65.[2]  (*Id.*).

---

[2]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. Individuals with scores of 61-70 are classified as having some mild symptoms or some difficulty in social, occupational or school functioning, but generally functioning pretty well and able to have meaningful relationships. *Id.* at 32. Individuals with scores of 51-60 are classified as having "moderate" symptoms. *Id.* at 32. Individuals with GAF scores of 41-50 are classified as having serious symptoms or serious impairment in social, occupational, or school functioning. *Id.*

Dr. Rahman's March 2011 treatment note states that plaintiff was mostly euthymic with no suicidal or homicidal ideation or visual or auditory hallucinations.  (Tr. 679).  Dr. Rahman diagnosed plaintiff with DSM-IV code 295.7, schizoaffective disorder.  (Tr. 680).  *See also* DSM-IV at 323, http://psychcentral.com/disorders/sx31-c.htm (last visited May 28, 2015).  Dr. Rahman's July 2011 progress note is substantially the same as the March 2011 note, though plaintiff reported "some difficulty with stress."  (Tr. 677-78).  In November 2011, the "Objective" portion of Dr. Rahman's progress note provides "Guarded" and notes that plaintiff continued to have no suicidal or homicidal ideation or visual or auditory hallucinations.  (Tr. 675).  The January 2012 progress note simply documents that plaintiff was observed as euthymic.  (Tr. 673).  The record includes a mostly illegible December 2012 progress note from Dr. Rahman which appears to note that plaintiff was guarded and tense but continued to have no suicidal or homicidal ideation or visual or auditory hallucinations.  (Tr. 1042-43).

The January 2011 to November 2012 case management notes from Tierrah Brown Mayfield, plaintiff's case manager at Centerpoint Health, consistently document that plaintiff's mood was euthymic; his affect was bright; he was cooperative; his stream of thought was clear and coherent; he had no suicidal or homicidal ideation; and he was oriented x3.  *See* Tr. 830, 834, 835, 836, 840, 843, 844, 845, 852, 853, 856, 858, 863, 865, 867, 875, 1007, 1016, 1017.  However, in February 2011 plaintiff's mood was anxious and his behavior was guarded but cooperative (Tr. 872); in July 2012, plaintiff's mood was observed as depressed (Tr. 1013); in October 2012, his affect was flat, his mood was anxious, and he was hyperactive.  (Tr. 1008, 1011).  Shawn Storey of Centerpoint Health observed on September 26, 2012, that plaintiff's

8

affect was flat and he was guarded and withdrawn and noted that "the smell of alcohol was apparent when [plaintiff] spoke."[3]    (Tr. 1011).

The opinion evidence from Centerpoint Health consists of an August 2011 mental status questionnaire completed by Dr. Rahman and a February 2012 mental impairment questionnaire completed by Dr. Rahman and Ms. Mayfield.    (Tr. 634-36, 960-66).    Dr. Rahman opined in August 2011 that plaintiff exhibited appropriate appearance, clear speech, euthymic mood and affect, racing thoughts at times, poor concentration and short term memory, and normal insight/judgment.    (Tr. 634).    Dr. Rahman reported that plaintiff's diagnosis was major depressive disorder.    (Tr. 635).    Dr. Rahman opined that plaintiff had a "normal" ability to remember, understand and follow instructions; a "poor" ability to maintain attention; and a "poor" ability to sustain concentration, persist at tasks and complete them in a timely fashion. (*Id.*).    Dr. Rahman further opined that plaintiff's paranoid thoughts prohibit him from social interactions and that he would react poorly to the pressures of a work setting involving simple, routine, and repetitive tasks.    (*Id.*).

The February 10, 2012 Mental Impairment Questionnaire completed by Dr. Rahman and Ms. Mayfield include a diagnosis of schizoaffective disorder and a notation that plaintiff's highest GAF score in the past year was a 50.    (Tr. 960).    When asked to describe what clinical findings support the opinion, Dr. Rahman provided "flat affect" and "poor eye contact."    (*Id.*). Plaintiff was noted as having several symptoms including hallucinations and pressures of speech.

_____

[3]Plaintiff's primary care physician, Michael Justin, M.D., treated plaintiff in February 2012 after plaintiff suffered a fall.    (Tr. 988-89).    During the examination, plaintiff acknowledged drinking about three-to-four beverages every other day, but denied being intoxicated when he fell off a roof (fracturing four ribs and rupturing his spleen) the month before.    (Tr. 988).    On examination, plaintiff's mood and affect were "appropriate with no depression, anxiety, or agitation," and he seemed "subdued, possibly intoxicated" asking "several questions repeatedly."    (Tr. 989).

9

The treating providers opined that plaintiff was unable to maintain attention for two hour segments or complete a normal work day and week without interruptions from his psychological symptoms. (Tr. 961-62). Plaintiff was determined to have moderate restriction in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation in the past 12 months. (Tr. 964).

Consultative examining psychologist George Lester, Psy.D., examined plaintiff on behalf of the state agency on March 21, 2011. (Tr. 601-07). Dr. Lester observed that plaintiff's grooming and hygiene were appropriate; he had good eye contact and appeared relaxed; he was cooperative, engaged, polite, and pleasant; and he exhibited an appropriate but somewhat constricted affect. (Tr. 604). Plaintiff reported that he hears strange noises and people talking which interferes with his sleep. (Id.). Dr. Lester found that plaintiff was alert and oriented times three; he recalled four of five objects after a five minute delay; he recalled five digits forward and three digits in reverse; and he made one error on a Serial 7 Task backwards from 100. (Tr. 605).

Dr. Lester opined that plaintiff appeared to have sufficient information, judgment, and common sense reasoning ability to live independently. (Tr. 606). Dr. Lester diagnosed plaintiff with bipolar I disorder with psychotic features and assigned him a GAF score of 55. (Tr. 606-07). Dr. Lester found that plaintiff exhibited no difficulty with comprehension on testing but noted that plaintiff's reported intermittent psychotic and paranoid symptoms could interfere with his comprehension abilities. (Tr. 607). Dr. Lester opined that plaintiff's pace and

persistence were appropriate, but again noted that plaintiff's subjectively reported symptoms might interfere with his abilities in this area. (*Id*.).

At the request of the state agency, the evidence was reviewed on April 12, 2011, by David Dietz, Ph.D. (Tr. 205-14). Dr. Dietz found that plaintiff had mild restrictions in his activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of extended duration. (Tr. 211). Dr. Dietz opined that plaintiff was moderately limited in the following abilities: understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; working in coordination with or in proximity to others without being distracted by them; completing a normal work day and work week without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and respond appropriately to criticisms from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and responding appropriately to changes in the work place. (Tr. 213-14). He further opined that plaintiff was not significantly limited in his abilities to remember work-like procedures; understand, remember, and carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request simple assistance; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (*Id*.). Dr. Dietz concluded that plaintiff "appears to be capable of completing 3 to 4 step tasks that do not have strict production standards or schedules in an environment that does not require more

11

than superficial social interactions.   He does better with smaller groups of familiar others."   (Tr. 214).   Dr. Dietz's findings were affirmed on reconsideration by Karla Voyten, Ph.D. in November 2011.   (Tr. 247-61).

The ALJ gave "great weight" to the limitations set forth by Drs. Dietz and Voyten finding their analyses "generally persuasive and consistent with the overall record. . . ."   (Tr. 89).   In contrast, the ALJ determined that the opinion set forth in the February 2012 Mental Impairment Questionnaire completed by Dr. Rahman and Ms. Mayfield was entitled to "little weight" because it was "unsupported by the medical record [and] inconsistent with treatment notes and the overall record."   (Tr. 87).   The ALJ accordingly adopted the limitations set forth by the state agency psychologists and determined that plaintiff retained the RFC to perform a full range of work at all exertional levels with the following nonexertional limitations: "he is capable of completing 3-4 step tasks that do not have strict production standards or schedules, in an environment that does not require more than superficial social interactions and where he could work in smaller groups of familiar others."   (Tr. 84-85).

Plaintiff asserts the ALJ's RFC formulation is not substantially supported because the record demonstrates that he has additional work-related limitations.   (Doc. 6 at 3-6).   Plaintiff alleges the ALJ erred by not finding that plaintiff is limited in his persistence or pace as the state agency reviewing psychologists, whose opinions were given "great weight," found plaintiff has moderate limitations in concentration, persistence or pace and Dr. Rahman opined that he was markedly limited in this area.   (*Id.* at 4, citing Tr. 240, 964).   Plaintiff further argues the ALJ erred by not adopting Drs. Dietz and Voyten's finding that he has moderate limitations in maintaining attention for extended periods and in completing a normal work day and week

12

without interruptions from his psychological symptoms.   (*Id.*, citing Tr. 242-44).   Likewise,

plaintiff claims the ALJ erred by not adopting Dr. Lester's finding that plaintiff's psychiatric

symptoms may interfere with the attention, persistence, or pace required for simple tasks or his

treating psychiatrist's conclusion that plaintiff has "poor work-related abilities in other areas."

(*Id.* at 4-5, citing Tr. 607, 964).   Plaintiff therefore concludes that the ALJ's RFC formulation

lacks substantial support in the record because it fails to accommodate the work limitations

found by these medical sources.   (*Id.* at 5-6).

Contrary to plaintiff's assertion that the ALJ impermissibly omitted limitations set forth

by the state agency psychologists, the ALJ adopted the findings of Drs. Dietz and Voyten and

incorporated their limitations verbatim in formulating plaintiff's RFC.   As stated above, Drs.

Dietz and Voyten opined that plaintiff is "capable of completing 3 to 4 step tasks that do not have

strict production standards or schedules, in an environment that does not require more than

superficial social interactions [and that he] does better with smaller groups of familiar others."

(Tr. 244, 259).   This is the exact language employed by the ALJ in formulating plaintiff's RFC.

*See* Tr. 84-85.   Plaintiff's claim that the ALJ's decision does not embody the limitations set

forth by the state agency psychologists in formulating plaintiff's RFC is therefore without basis.

To the extent plaintiff maintains the ALJ erred by not discussing the reviewing

psychologists' responses to every question set out in the Disability Determination Explanation

forms, *see* Tr. 212-14, 243-44, the Court disagrees.   These forms explicitly provide that the

questions set out "help determine the individual's ability to perform sustained work activities.

However, *the actual mental residual functional capacity assessment* is recorded in the *narrative

discussion(s)* in the explanation text boxes."   Tr. 213 (emphasis added).   *See also* Tr. 242

13

(providing further that the narrative discussion "describes how the evidence supports each conclusion."). Thus, the ALJ's failure to discuss the state agency psychologists' responses to each individual question is not error as she incorporated their "actual" RFC assessments in her RFC formulation.[4]

Moreover, plaintiff's assertion that "the ALJ found no limitations on persistence or pace in working" (Doc. 6 at 4) is belied by a review of the ALJ's decision. The ALJ determined at Step Three of the sequential analysis that plaintiff had moderate difficulties in concentration, persistence or pace based on the conclusions of the state agency psychologists and Dr. Lester. (Tr. 84). The ALJ also noted that the state agency psychologists found that plaintiff is moderately limited in his ability to understand, remember, and carry out detailed instructions as the complexity of task demands rises and in his ability to work in coordination or proximity with others without being distracted by them. (Tr. 88-89, citing Tr. 242-43, 257-58). The ALJ appropriately accommodated plaintiff's established moderate limitations in concentration, persistence or pace by limiting him to work that does not have strict production standards or schedules. *See* Tr. 84. This RFC adequately accommodates plaintiff's moderate limitations in concentration, persistence or pace as found by Drs. Dietz and Voyten. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 510, 516-17 (6th Cir. 2010) (where an ALJ expressly adopts persistence or pace-based limitations articulated by a medical source, the ALJ's RFC formulation must accurately portray the limitations found). The ALJ here formulated an RFC that mirrors exactly the limitations set forth by the state agency psychologists regarding plaintiff's deficiencies in

---

[4]Notably, plaintiff does not explain how the ALJ's discussion of these responses would alter her RFC formulation given the state agency psychologists' narrative explanation of his limitations, which the ALJ adopted in whole.

14

concentration, persistence or pace.   Accordingly, the ALJ did not err by failing to accommodate plaintiff's limitations in pace or persistence.

Plaintiff further argues that the ALJ erred by not adopting Dr. Lester's opinion "that the onset of [plaintiff's] psychiatric symptoms may interfere with the attention, persistence, or pace required for simple tasks" and by failing to note that plaintiff "had problems with his work schedule in the past."   (Doc. 6 at 4, citing Tr. 607).   The opinion portion of Dr. Lester's consultative examination report provides only that the doctor observed that plaintiff had no difficulty with comprehension and that he had appropriate pace and persistence during testing. (Tr. 607).   The doctor additionally noted plaintiff's subjective reports: "He does report intermittent psychotic and paranoid symptoms which could interfere with his abilities in [understanding, remembering and carrying out instructions]" and "onset of psychotic symptoms may interfere with his ability in [maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks]."   (*Id.*).   Dr. Lester did not opine that plaintiff had any definite limitations in these areas due to his mental impairment; he simply noted the potential of some unknown level of limitation based on plaintiff's subjective reports.   The ALJ was not required to include additional limitations in formulating plaintiff's RFC based solely on subjective complaints that are not supported by clinical observations.   *See Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 273-74 (6th Cir. 2010).   Moreover, plaintiff does not explain what additional limitations the ALJ should have included.   The undersigned therefore finds that the ALJ accurately recited Dr. Lester's findings in her decision (Tr. 84, citing Tr. 607) and committed no error in this regard.[5]

_____

[5]Plaintiff's arguments that the ALJ erred by not adopting the limitations set forth by Dr. Rahman and Ms. Mayfield are addressed *infra* in connection with plaintiff's second assignment of error.

Lastly, plaintiff inserts the following argument into the middle of his first assignment of error: "[The ALJ] erred in evaluating the mental impairments in failing to note the diagnosis of schizoaffective disorder, 295.70 in the DSM-IV-TR, consistently found by Dr. Rahman." (Doc. 6 at 5, citing Tr. 676, 678, 680, 960, 1002, 1004). Plaintiff argues that: (1) this diagnosis is consistent with Dr. Rahman's February 2012 opinion; (2) "the schizoaffective disorder is not due to alcohol or drug use"; and (3) "[this diagnosis] contradicts [the ALJ's] finding of alcohol abuse." (Id.). It is unclear whether plaintiff is arguing that the ALJ erred at Step Two of the sequential evaluation process by failing to find that plaintiff suffered from the additional severe impairment of schizoaffective disorder or whether he is arguing the ALJ erred in finding that plaintiff's alcohol abuse is a severe impairment. In either event, the undersigned finds the ALJ did not commit reversible error in these two regards.

Plaintiff's argument that the ALJ erred by not finding schizoaffective disorder as an additional severe impairment is without merit. While Dr. Rahman noted "295.70" - schizoaffective disorder - as plaintiff's primary diagnosis on several treatment records, *see*, *e.g.*, Tr. 676, 678, 680, 682, 1002, 1004 (records spanning from December 2010 to April 2012), the Centerpoint Health case management progress notes from this period document major depressive disorder, an unspecified mood disorder, and bipolar disorder as plaintiff's primary diagnoses. *See* Tr. 531, 544, 576, 580, 583, 585.[6] Even Dr. Rahman noted major depressive disorder as plaintiff's primary diagnosis in his August 2011 opinion and similarly identified major depressive disorder as plaintiff's primary diagnosis on a November 2012 Individual Service Plan update. *See* Tr. 635, 1019. Moreover, Dr. Lester diagnosed plaintiff with bipolar disorder

---

[6]The February 2010 diagnosis of bipolar disorder appears to be from Dr. Rahman.

16

pursuant to his examination during which plaintiff reported he had been diagnosed with schizophrenia in his teens and bipolar disorder in his twenties.  *See* Tr. 602, 606.  Plaintiff's primary care physician also diagnosed plaintiff with bipolar disorder.  *See* Tr. 990.  Given the inconsistent diagnoses in the record, it was reasonable for the ALJ to identify bipolar disorder as plaintiff's severe impairment rather than schizoaffective disorder.  In any event, even if the ALJ erred by not discussing the schizoaffective disorder diagnosis or finding it to be a severe impairment, any error in this regard is harmless as she considered the limiting effects of plaintiff's mental impairments at Step Four of the sequential evaluation process and appropriately accommodated them in formulating the RFC.  *See Maziarz v. Sec'y of H.H.S.*, 837 F.2d 240, 244 (6th Cir. 1987).

Lastly, the record evidence substantially supports the ALJ's finding that plaintiff's alcohol abuse is a severe impairment.  One of the few treatment notes from Centerpoint Health that indicates plaintiff was not euthymic includes the notation: "the smell of alcohol was apparent when [plaintiff] spoke."  (Tr. 1011).  Likewise, plaintiff's primary care physician noted that plaintiff reported drinking 3-4 alcohol beverages every other day; observed that plaintiff smelled of alcohol during the examination; noted that plaintiff refused to quit drinking alcohol; and diagnosed him with nondependent alcohol abuse.  *See* Tr. 982, 985, 988, 990.  The ALJ noted several additional references to plaintiff's alcohol consumption in the record.  *See* Tr. 86, citing Tr. 534, 537, 543, 593.  In light of this evidence showing plaintiff's ongoing use of and unwillingness to discontinue using alcohol, the ALJ's finding that plaintiff's alcohol abuse is a severe impairment is substantially supported by the record.

17

For the above reasons, the RFC formulated by the ALJ is supported by substantial evidence and plaintiff's first assignment of error should be overruled.

2. <u>Whether the ALJ erred in weighing the mental health opinion evidence of record</u>.

Plaintiff alleges the ALJ erred in weighing the mental health opinion evidence of record. Plaintiff contends Dr. Rahman's February 2012 opinion should have been given controlling weight because it was supported "with information on [the] form." (Doc. 6 at 6). Plaintiff alleges the ALJ also erred by discounting Dr. Rahman's opinion on the basis of plaintiff's perceived use of alcohol. (*Id*. at 7). Plaintiff claims his reported activities of daily living support the limitations set forth by Dr. Rahman. (*Id*.). Additionally, plaintiff argues the ALJ erred by citing to records showing plaintiff had a GAF score of 65 and records showing that his mental difficulties were mild. (*Id*.). Plaintiff maintains that the ALJ's stated bases for discounting Dr. Rahman's opinion were not "good reasons" under *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004). (*Id*. at 8). Plaintiff concludes that the ALJ erred by giving "great weight" to the state agency psychologists' opinions because they were based on an incomplete review of the record evidence. (*Id*.).

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). "The treating physician doctrine is based on the assumption that a medical professional who has dealt

18

with a claimant and his maladies over a long period of time will have a deeper insight into the

medical condition of the claimant than will a person who has examined a claimant but once, or

who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th

Cir. 1994).

     "Treating-source opinions must be given 'controlling weight' if two conditions are met:

(1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic

techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the]

case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20

C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  If the

ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the

factors set forth in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6) in determining what

weight to give the opinion. *See Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  These

factors include the length, nature and extent of the treatment relationship and the frequency of

examination.  20 C.F.R. §§ 404.1527(c)(2)(i)(ii), 416.927(c)(2)(i)(ii); *Wilson*, 378 F.3d at 544.

In addition, the ALJ must consider the medical specialty of the source, how well-supported by

evidence the opinion is, how consistent the opinion is with the record as a whole, and other

factors which tend to support or contradict the opinion.  20 C.F.R. §§ 404.1527(c)(3)-(6),

416.927(c)(3)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

     "Importantly, the Commissioner imposes on its decision makers a clear duty to 'always

give good reasons in [the] notice of determination or decision for the weight [given a] treating

source's opinion.'" *Cole*, 661 F.3d at 937 (citation omitted).  *See also Wilson*, 378 F.3d at 544

(ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion).

Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (citing SSR 96-2p, 1996 WL 374188 (1996)). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Gayheart*, 710 F.3d at 544 (quoting *Wilson*, 378 F.3d at 544).

The ALJ's decision to give little weight to the opinion put forth by Dr. Rahman and Ms. Mayfield is substantially supported by the evidence of record. Dr. Rahman and Ms. Mayfield opined, *inter alia*, that plaintiff had "no useful ability to function" to: complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in a routine work setting; and deal with normal work stress. (Tr. 962). They also opined that plaintiff was "unable to meet competitive standards" in his ability to understand and remember very short and simple instructions; maintain attention for a two hour segment; sustain an ordinary routine without special supervision; and work in coordination or in proximity to others. (*Id.*). When asked to explain what medical or clinical findings supported these limitations, Dr. Rahman and Ms. Mayfield provided simply: "↓ concentration, ↓ ability to tolerate stress." (Tr. 963).

The ALJ accurately determined that these conclusions are "belied by many of the treatment notes of [Ms. Mayfield] and Dr. Rahman." (Tr. 86). As detailed *supra*, Dr. Rahman's treatment notes consistently document that plaintiff exhibited good eye contact; presented with a euthymic, stable, or "ok" mood; was cooperative; had no suicidal or homicidal

ideation or visual or auditory hallucinations; and had linear thought processes.  *See* Tr. 584, 580,

582, 673, 675, 679, 681, 1042-43.   Plaintiff's assessments at Centerpoint Health and Ms.

Mayfield's case management notes similarly document that plaintiff was cooperative and well

oriented; his mood was euthymic with a congruent, bright, or appropriate affect; he had no

suicidal or homicidal ideation; and his stream of thought was clear and coherent.  *See* Tr. 592,

830, 834, 835, 836, 840, 843, 844, 845, 852, 853, 856, 858, 863, 865, 867, 872, 875, 1007, 1016,

1017.   Indeed, there are only intermittent notations in the whole of the clinical evidence from

Centerpoint Health that document negative findings and those are mostly mild in nature.  *See* Tr.

584 (in February 2010, Dr. Rahman noted that plaintiff appeared mildly anxious); Tr. 592 (in

February 2011, plaintiff was restless and presented with a tense posture and pressured and

stammering speech); Tr. 872 (in February 2011, plaintiff was observed as anxious); Tr. 1013 ( in

July 2012, plaintiff's mood was depressed and he was hyperactive); Tr. 1011 (in September

2012, plaintiff was guarded and withdrawn with a flat affect but he was also noted as smelling of

alcohol at this visit).   The vast majority of the treatment records from Centerpoint Health portray

plaintiff as functioning well and do not support the severe limitations found by Dr. Rahman and

Ms. Mayfield.   It was therefore reasonable for the ALJ to discount their severely restrictive

findings on this basis.  *See* 20 C.F.R. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4) (whether a

treating source's opinion is consistent with and well-supported by the other record evidence are

factors to consider in weighing the opinion).  *See also Gant v. Comm'r of Soc. Sec.*, 372 F.

App'x 582, 584 (6th Cir. 2010) (upholding ALJ's decision to discount treating source's opinion

that was not supported by and inconsistent with her own treatment notes).

Further, Dr. Rahman and Ms. Mayfield's conclusions are inconsistent with the record evidence as a whole.   Dr. Lester's examination revealed that plaintiff's comprehension, concentration, pace and persistence were adequate during testing (Tr. 606-07), which is not consistent with Dr. Rahman's finding that plaintiff has severe restrictions in his ability to understand and remember very short and simple instructions and maintain attention for a two hour segment.  *See* Tr. 962.   Likewise, the state agency psychologists reviewed the treatment notes from Centerpoint Health documenting largely normal findings and determined that plaintiff retained the ability to perform work with the limitations set forth in the ALJ's RFC.   Plaintiff's own testimony and his sister's reports that plaintiff has maintained friendships for several years, regularly socializes, shops on a weekly basis, prepares meals on a daily basis without encouragement, and regularly cares for and walks his dog are inconsistent with Dr. Rahman and Ms. Mayfield's determination that he is unable to sustain an ordinary routine without special supervision or interact appropriately with the general public.   *See* Tr. 124-25, 432-36, 962-63. Given the inconsistencies between the severe limitations set forth in the February 2012 opinion of Dr. Rahman and Ms. Mayfield and their own treatment records, Dr. Lester's examination findings, the opinions of the state agency reviewing psychologists, and the reports of plaintiff and his sister, it was reasonable for the ALJ to give this treating source opinion "little weight." *See* 20 C.F.R. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4); *Gant*, 372 F. App'x at 584.

Moreover, the ALJ's decision to give "great weight" to the findings of the state agency reviewing psychologists is supported by substantial evidence despite the incomplete nature of their review.   Dr. Dietz rendered his opinion in April 2011 upon his review of Dr. Lester's March 2011 consultative examination report and Dr. Rahman's February 2010 mental status

examination at Centerpoint Health which was largely normal as detailed above. *See* Tr. 210, 584-85, 601-08. Dr. Voyten rendered her opinion in November 2011 based on her review of this evidence, the July 2011 treatment notes from Centerpoint Health signed by Dr. Rahman showing plaintiff was euthymic but having some difficulty with stress, and Dr. Rahman's August 2011 opinion. *See* Tr. 244, 634-36, 677-78. Although the opinions of the state agency psychologists were formed without a complete review of the Centerpoint Health treatment notes or Dr. Rahman and Ms. Mayfield's February 2012 opinion, the ALJ's decision is nevertheless substantially supported by the record.

There is no regulation or case law that requires the ALJ to reject an opinion simply because medical evidence is produced after the opinion is formed. Indeed, the regulations provide only that an ALJ should give more weight to an opinion that is consistent with the record as a whole. 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). Unlike the agency reviewing psychologists, the ALJ had the opportunity to review the entire record, including all of Dr. Rahman and Ms. Mayfield's notes, and explained that she gave more weight to the opinions of Drs. Dietz and Voyten because they were "consistent with the overall record" while Dr. Rahman's was not. (Tr. 89). That these psychologists did not have the opportunity to review all of the evidence from Centerpoint Health does not change the fact that Dr. Rahman's opinion was not supported by clinical findings or consistent with his own treatment records or the other evidence of record as discussed above.

Further, the later-generated evidence is substantially similar to the evidence reviewed by Drs. Dietz and Voyten. *Compare* Tr. 584-85, 677-78 (in February 2010 and March 2011, plaintiff presented with a euthymic mood, some anxiety, fair insight and judgment, and reported

some problems with stress) *with* Tr. 673, 830-31, 834-835 (plaintiff was euthymic in January

2012 when observed by Dr. Rahman and was euthymic with appropriate affect when seen by Ms.

Mayfield in December 2011, January 2012, and February 2012). While some later treatment

notes document that plaintiff was "tense" or depressed, *see, e.g.*, Tr. 1013 (July 2012), 1042-43

(December 2012), plaintiff reported in November 2012 that he was doing well and he was

observed as euthymic with a bright affect. *See* Tr. 1007. Given the similarity in findings

between the later-generated evidence and the evidence reviewed by Drs. Dietz and Voyten, the

consistency of their opinions with the whole of the record evidence, and the lack of evidence

showing that plaintiff suffers from additional mental limitations not accommodated by their

opinions, the ALJ's decision to given their opinions "great weight" is supported by substantial

evidence despite the incomplete nature of their review.

      For these reasons, the ALJ did not err in weighing the mental health opinion of record and

plaintiff's second assignment of error should be overruled.

      3. <u>Whether the ALJ erred in discounting plaintiff's credibility</u>.

      For his third assignment of error, plaintiff contends the ALJ erred in discounting his

credibility. The ALJ determined that plaintiff "was not a wholly credible witness" and that "his

testimony did not provide a credible basis for finding him to have greater limitations than are set

forth" in the RFC formulation. (Tr. 85). The ALJ noted that plaintiff continues to smoke

cigarettes despite his history of myocardial infarction and heart problems which "suggests that he

may be unwilling to take all necessary measures to ensure that his health is as good as possible."

(*Id.*). The ALJ further discussed that plaintiff was previously able to work despite his

long-standing mental impairments and that "[t]here was nothing to indicate that his mental status

is more limiting now than it was [then]." (*Id.*). The ALJ noted that despite plaintiff's claims of having difficulty in social functioning, the record demonstrates that plaintiff gets along with and relies on family and friends. (*Id.*). The ALJ further noted that plaintiff made inconsistent statements in the record, including testifying at the ALJ hearing that he did not get along with coworkers but telling his mental health caregivers in December 2009 the opposite. (*Id.*, citing Tr. 546). The ALJ explained that "[t]his is an inconsistency in [plaintiff]'s statements that goes directly to his primary basis for alleging being disabled." (*Id.*). The ALJ identified another inconsistency between plaintiff's statement to his counselor at Centerpoint Health that he had never been fired and his report to Dr. Lester that he had been fired from multiple jobs. (*Id.*, citing Tr. 547, 604).

Plaintiff argues that the ALJ erred in discounting his credibility because: (1) his impairments are mental and not related to his smoking; (2) the record shows that his mental state deteriorated and he is more limited now than he was when he was working; (3) his activities of daily living do not equate to an ability to perform daily work; (4) the ALJ erred under 20 C.F.R. § 404.1529 and Social Security Ruling 96-7p in failing to consider the effects of his medication or his good work history in assessing his credibility; and (5) the ALJ erred in finding that his use of alcohol made him less credible. (Doc. 6 at 9-10).

It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Rogers*, 486 F.3d at 247 (citations omitted). In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Kirk v. Sec'y of H.H.S.*, 667 F.2d 524, 538 (6th Cir. 1981).

"If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec'y of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

The ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." *Rogers*, 486 F.3d at 247. Rather, such determinations must find support in the record. *Id.* Whenever a claimant's complaints regarding symptoms or their intensity and persistence are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." *Id.* "Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant while inconsistency, although not necessarily defeating, should have the opposite effect." *Id*. at 248.

The ALJ's credibility determination is supported by substantial evidence. First, contrary to plaintiff's assertion that the ALJ erred by considering his tobacco use in assessing his credibility, the Sixth Circuit has determined that an ALJ may properly consider a claimant's ongoing tobacco use in assessing credibility where it establishes noncompliance with a medical provider's directions to stop smoking. *See Blaim v. Comm'r of Soc. Sec.*, 595 F. App'x 496, 498 (6th Cir. 2014) (affirming ALJ's decision to discount the claimant's credibility due in part to his refusal to stop smoking despite his medical providers' advice); *Hall-Thulin v. Comm'r of Soc. Sec.*, 110 F.3d 64, 1997 WL 144237, at *1 (6th Cir. Mar. 27, 1997) (quoting *Sias v. Sec'y of*

26

*H.H.S.*, 861 F.2d 475, 480 (6th Cir. 1988)) (finding that the claimant's failure to stop smoking was inconsistent with his claims on intractable pain).   The Court acknowledges the difficulties of quitting smoking but this is not a case where a claimant has been unable to quit despite making efforts.   Rather, the record shows that plaintiff was advised to stop smoking by his primary care physician on multiple occasions but refused and repeatedly stated that he was "not ready to quit at this time."   *See* Tr. 984, 987, 990.   It was reasonable for the ALJ to determine that plaintiff's subjective statements are less than credible given his history of cardiac and pulmonary problems and his refusal to quit smoking against the advice of his primary care physician.   *See Galinis v. Comm'r of Soc. Sec.*, No. 1:07-cv-118, 2008 WL 360656, at *8 (W.D. Mich. Feb. 8, 2008) ("[W]here a claimant declines to stop smoking despite being instructed by [his] care providers otherwise is an appropriate factor to consider when assessing the claimant's credibility.").

Second, the evidence plaintiff relies on in support of his claim that his mental state deteriorated after 2010 is unpersuasive.   Plaintiff cites to his sister's statements in a December 2010 Third Party Function report that his bipolar disorder was "spiraling downward" and had precluded him from maintaining employment.   (Doc. 6 at 9, citing Tr. 432-39).   As reasonably noted by the ALJ, this is a lay opinion that is inconsistent with the clinical evidence of record from Centerpoint Health that shows plaintiff was stable and doing well generally.   *See Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) (citing *Lashley v. Sec'y of Soc. Sec.*, 708 F.2d 1048, 1054 (6th Cir. 1983)) (Lay witness statements are "entitled to perceptible weight only if [they are] fully supported by the reports of the treating [sources].").   Accordingly, the ALJ did not err in refusing to credit plaintiff's sister's claims regarding his inability to perform substantial

27

gainful activity.

Third, plaintiff's argument that the ALJ erred under 20 C.F.R. § 404.1529[7] by not noting his use of Haldol or its side effects in assessing his credibility (Doc. 6 at 10) is not well-taken. The ALJ's decision explicitly cites to plaintiff's ALJ hearing testimony that he takes Haldol and Wellbutrin. *See* Tr. 82. Further, the clinical treatment records from Centerpoint Health consistently document that plaintiff did not experience "intolerable" side effects from and was comfortable with taking Haldol, and that Haldol was effective. *See*, *e.g.*, Tr. 585, 593, 676, 682, 1000. *See also* Tr. 1017 (plaintiff reported in March 2012 that Wellbutrin was helpful with his mood).[8] Although the ALJ did not directly address Dr. Rahman's notation that plaintiff's medications caused "tiredness" as a side effect, *see* Tr. 960, this is the only mention of this side effect and there is nothing else in the record to suggest that plaintiff's functional abilities are in any way impaired by this medication. Indeed, plaintiff testified that he was able to work full-time for a number of years while taking Haldol, which suggests that it does not inhibit his ability to perform work-related activity. *See* Tr. 112-14. Given the absence of record evidence showing that plaintiff's functional abilities are in any way adversely impacted by his medications, the ALJ's credibility assessment adequately complies with the dictates of 20 C.F.R. § 404.1529.

To the extent plaintiff argues the ALJ erred by discounting his credibility on the bases of his activities of daily living and alcohol use, these claims lack merit. The reasons given by the ALJ for finding plaintiff's statements less than fully credible are stated above and do not include any reference to either his activities of daily living or his use of alcohol.

---

[7]20 C.F.R. § 404.1529 lays out the factors an ALJ will consider in assessing a claimant's symptoms, which include "[t]he type, dosage, effectiveness, and side effects of any medication. . . ." 20 C.F.R. § 404.1529(c)(3)(iv).

[8]Notably, these records provide further support for the ALJ's credibility finding as they contradict plaintiff's testimony that Haldol was not helpful in controlling his symptoms. *See* Tr. 115.

Further, the reasons provided by the ALJ for not crediting plaintiff's claims are substantially supported by the record. The ALJ noted that plaintiff's testimony about his alleged inability to deal with people or the public (Tr. 119-21) was inconsistent with reports from plaintiff and his sister that he regularly socializes and drinks with friends and family. (Tr. 85, citing Tr. 119-21, 428, 436, 543-44). *See also* Tr. 607 (plaintiff reported that he engaged in "negligible socialization" during the consultative examination). As stated above, the ALJ placed great emphasis on the inconsistency between plaintiff's testimony and his statements to healthcare providers regarding his ability to get along with coworkers because it "goes directly to his primary basis for alleging being disabled." *See* Tr. 85-86, citing Tr. 112, 546. *See also* Tr. 547, 603 (plaintiff reported to Dr. Lester that he did not get along with coworkers, supervisors, or the general public and that he had been fired from jobs as a result of his mental health symptoms, but he told a counselor at Centerpoint Health that he had never been fired from work). The ALJ was entitled to discount plaintiff's credibility given his inconsistent statements about the impact of his mental health impairments on his ability to work.

Lastly, plaintiff's argument that the ALJ committed reversible error by not noting his good work history in assessing his credibility is unpersuasive. "The key ruling governing an ALJ's evaluation of a claimant's credibility, SSR 96-7p, lists seven factors which go into that determination, and the fact that the claimant had a good work history is not one of them." *Gossett v. Comm'r of Soc. Sec.*, No. 2:13-cv-106, 2013 WL 6632056, at *8 (S.D. Ohio Dec. 17, 2103) (Report and Recommendation), *adopted*, 2014 WL 49818 (S.D. Ohio Jan. 7, 2014). Given the substantial support in the record for the ALJ's credibility determination, the undersigned finds that any oversight by the ALJ in failing to mention plaintiff's good work

history does not constitute reversible error.

Accordingly, the ALJ's decision to discount plaintiff's credibility is supported by substantial evidence and plaintiff's third assignment of error should be overruled.

5. Whether the ALJ's erred at Step Five of the sequential evaluation process.

Plaintiff's fourth assignment of error is two-fold.   Plaintiff first asserts the ALJ erred under 20 C.F.R. § 404.1565(a) in finding that his prior relevant work includes his position as a metal cleaner.   Plaintiff contends that the record does not establish that he performed this job for the requisite time period or at a substantial gainful activity level for it to be considered past relevant work.[9]   (Doc. 6 at 11).

At the ALJ hearing, plaintiff testified that he performed work for CM Temporary Services as a metal cleaner at a rate of 30 hours per week.   (Tr. 111).   A June 2010 Work Activity Report reflects that plaintiff completed this work from March to August 2010.   (Tr. 380).   However, in December 2010, the Social Security Administration specifically determined that this position did not qualify as substantial gainful activity.   *See* Tr. 387.   Consequently, the ALJ erred under 20 C.F.R. § 404.1565(a) in classifying this job as past relevant work.

Nevertheless, this error is harmless.   The ALJ alternatively determined at Step Five of the sequential evaluation process that plaintiff could perform work that exists in significant numbers in the national economy as a medium cleaner and medium material handler based on the VE's testimony.   *See* Tr. 89-90, 144-45.   Therefore, the ALJ met her Step Five burden of identifying other work plaintiff could perform even if the metal cleaner job does not constitute past relevant work.

---

[9]To be considered past relevant work, the work experience must have been "done within the last 15 years, lasted long enough for [the claimant] to learn to do it, and was substantial gainful activity."   20 C.F.R. §

Plaintiff's second argument is that the ALJ's decision is not substantially supported because the hypothetical question presented to the VE did not account for all of his work-related limitations as provided by Dr. Rahman.  *See* Doc. 6 at 11.  This argument is simply a rehash of plaintiff's challenge to the ALJ's RFC determination.  Accordingly, the Court incorporates its rationale stated above and finds that the ALJ did not err in her Step Five finding because her RFC finding is substantially supported and the hypothetical question posed to the VE incorporated all of plaintiff's supported limitations.  *See Davis v. Sec'y of H.H.S.*, 915 F.2d 186, 188-89 (6th Cir. 1990) (an ALJ's finding of non-disability is substantially supported by evidence where it is based on alternate Step Five determination based VE's responses to proper hypothetical questions).

Accordingly, plaintiff's fourth assignment of error should therefore be overruled.

## III.  Conclusion

For the reasons stated above, **IT IS RECOMMENDED THAT** the decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date:  6/11/15

Karen L. Litkovitz
United States Magistrate Judge

404.1565(a).

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

DAVID W. BUSSE,                                          Case No. 1:14-cv-590
      Plaintiff,                                     Barrett, J.
                                                  Litkovitz, M.J.
  vs.

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.   Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.   If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.   A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.   Failure to make objections in accordance with this procedure may forfeit rights on appeal.   *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).